(C. D. 714)

Shalom & Co. *v.* United States

United States Customs Court, Second Division

(Decided December 24, 1942)

*Lane & Wallace (Samuel Isenschmid* of counsel) for the plaintiffs.
*Paul P. Rao,* Assistant Attorney General (*Richard H. Welsh,* special attorney),
for the defendant.

Before TILSON and KINCHELOE, Judges

TILSON, Judge: The plaintiffs filed this suit seeking to recover a certain sum of money alleged to have been illegally exacted as customs duties upon an importation of gloves. Duty was levied upon these gloves at the rate of 90 per centum ad valorem under paragraph 1529 (a) of the act of 1930, presumably upon the theory that they were lace articles. The plaintiffs claim the same to be properly dutiable at only 37½ per centum ad valorem under paragraph 919 of the act of 1930, as articles of wearing apparel of every description, manufactured wholly or in part, wholly or in chief value of cotton, and not specially provided for.

It has been agreed between counsel for the respective parties that the gloves are composed wholly of cotton having a staple of less than 1⅛ inches in length, and that they were made by hand. This eliminates these two questions from further consideration.

At the trial of the case a sample of the gloves in question and 16 illustrative exhibits were admitted in evidence and appropriately marked. In addition 13 witnesses testified for the plaintiffs, and 5 witnesses testified for the defendant.

The testimony of the witnesses for the plaintiffs was as a whole to the effect that the gloves in question were not lace gloves of any

kind, but were net gloves, that they were never bought and sold in the trade in the United States as lace gloves, but always as net gloves, while the testimony of the witnesses for the defendant was squarely to the contrary. Although we have given careful consideration to all the testimony, and have also carefully examined, inspected and considered all the samples it does not appear to be necessary or advisable to set out a detailed résumé of all the testimony.

The testimony of plaintiffs' witnesses was to the effect that laces and nets are separate and distinct classes of articles; that the essential difference between the two is that nets are plain mesh, or have dots on them like point d'esprit, which are figured nets, while laces have distinctive designs or patterns running right through the piece. This testimony was nowhere specifically denied by any of defendant's witnesses.

One witness for the plaintiffs testified that the gloves in this case are made in substantially the following manner:

In making the gloves the worker uses a short stick, about five inches long, and a needle around which thread is wound; that with the use of the stick, needle and thread the girl worker begins to make the glove at a point where the hand meets the cuff; she then works down, making one side of the thumb first, then she works up and down again, making the next finger, then she works up and back until one side of the glove is finished; that when she gets to the last finger she makes the other side of the hand, and when she came to the last part of the hand she continued to make the cuff, making one side first and then the other side. This was one continuous operation from start to finish, with a continuous thread, and all done by hand; that what might be called "knots" which appear on the back of the hand of the glove and on the cuff, were made by the worker in the course of the production of the glove as she went along; that when she came to the point where the so-called "knots" appear, they were made right at that point and then the worker continued from there; that when both sides of the glove were finished, the worker joined them together, and then the glove was finished; that whatever work appears on the glove was done in the course of making the glove.

The plaintiffs showed by one witness, whose testimony was not contradicted, that gloves like exhibit 1 are made in the same district in China where the filet net, which forms the foundation for making filet laces, is made, and that filet laces are not made by the same workers who make gloves like exhibit 1, although one of defendant's witnesses attempted to testify that the worker who made only the plain filet net was a lace maker and not a net maker. We shall dwell upon this point more later on.

One witness testified for the plaintiffs that filet laces are made in substantially the following manner:

Nets are imported from a certain section of China; by "nets" he means foundation pieces usually finished in certain sizes, like illustrative exhibit D; when the contractor gets the nets, he farms them out to various villages in certain districts, and these go to skilled workers, who have designs in front of them; these designs

furnished by the contractors are filled in on these nets, according to the pattern they have before them. When the design is completed they stretch the cloth and put it in shape for sale; that the needlework or filling-in process consists of a cross motion, back and forth, filling in to emulate the designs they have to copy; fill in certain squares and leave others blank, and in that way produce the design.

Typical samples of filet laces made in the manner just described were admitted in evidence as collective illustrative exhibit E. No one appears to have questioned the fact that these samples represented by collective illustrative exhibit E are what is known, recognized, and dealt in generally as filet laces, except one witness for the defendant who knew of another kind of filet lace known as buratto lace, concerning which we shall have more to say presently. A comparison of collective illustrative exhibit E and exhibit 1 is sufficient to clearly demonstrate the complete dissimilarity between the two articles.

Illustrative exhibit J was admitted in evidence as representing point d'esprit net. Illustrative exhibit K was admitted in evidence as representing embroidered machine-made net, and illustrative exhibit L was admitted in evidence as representing machine-made filet dotted net. No one denied the fact that these three exhibits represented net. A comparison of these three exhibits with exhibit 1 strongly tends to establish that the involved gloves are net gloves and that they are not lace gloves.

Although not expressed in identical language, all of plaintiffs' witnesses were in general agreement that the dots or knots or the grouping of threads on the back and on the cuff of exhibit 1 do not produce a design in any way like or similar to the design of any lace which they had ever seen or handled at any time. In this connection it may be well to point out that while witness Kohlberg testified on cross-examination that the grouped threads on the back of the hand and the grouped threads on the cuff of exhibit 1 are definitely grouped in a distinct design or pattern, this witness also testified that said grouped threads were not comparable or similar to the figure or design work in any lace with which he was familiar.

It is not to be assumed that any and all grouping of threads in a distinct design or pattern constitutes lace. In all embroidery work there is a definite grouping of threads in a distinct design or pattern, and yet it is a matter of common knowledge that all embroidery work does not make or constitute lace. We do not overlook the fact, however, that there are many well-known laces which are made by embroidering distinct designs or patterns upon an otherwise completed fabric or article, the most common of which is perhaps the well-known filet lace. It will thus be seen that there is nothing contradictory about the testimony of witness Kohlberg that the grouping of threads on exhibit 1 does not produce a design like or similar to the design in

any lace, and his testimony that the grouped threads on exhibit 1 are definitely grouped in a distinct design or pattern. Nor is there any indication in this testimony that this grouping of threads constituted or made exhibit 1 a lace glove.

Referring to the dots on exhibit 1, one witness stated:

It is a design, but nevertheless nobody would buy that design as a lace.

According to the testimony of the plaintiffs' witnesses, the general characteristic difference or distinction between articles which fall within the class of laces and those which fall within the class of nets, figured or otherwise, is that laces have a definite full design running through them, while nets are either plain or have dots on them.

Witness Kohlberg, after being thoroughly qualified on the subject of laces, stated that in general he was familiar with all kinds of laces and lace designs. In explaining lace designs he stated:

Well, there are tens of thousands of lace designs; maybe hundreds of thousands have been made; but they all, to a person in the trade, have some characteristics which divide them into classifications, and new designs coming out, in nearly all cases, fit into those subdivisions. An innumerable variety of designs all fall into certain classifications, and when I say this is not a lace design (referring to exhibit 1), it is not a design which falls into the classifications of lace designs I have been familiar with.

All of plaintiffs' witnesses who had bought and sold lace and net gloves over a long period of time and in substantial quantities agreed that gloves like or similar to exhibit 1 had always been sold as net or filet net gloves and that they had never been sold as filet lace gloves or as lace gloves of any kind.

The defendant offered the testimony of five witnesses to overcome the testimony given by the plaintiffs' thirteen witnesses. The defendant's witnesses testified in effect that exhibit 1 was a lace or filet lace glove and that it was not a net glove, plain or figured. Counsel for the defendant seems to place great reliance upon the testimony given by witness Powys. This witness testified that she is a lace expert and so represents herself to the public; that she is familiar with filet lace and has made it herself three or four times.

Witness Powys stated that there is what is known as "knotted" filet lace and "embroidery" filet lace. After describing what she termed the knotted filet lace, she stated that there was another kind of filet lace known as buratto, which was embroidered. This witness, however, admitted that in making filet lace herself she had first made the mesh or net and then embroidered the design on the net with the darning stitch, and that the filet lace which she made was similar to collective illustrative exhibit E.

Referring to collective illustrative exhibit E, this witness was asked if that is the thing commonly regarded as filet lace, and answered that "If a person came to ask for filet lace we would ask, which kind they wanted."

X Q. How long have you been doing that Miss Powys?—A. All the time I have had my shop, I have had the Buratto or Knotted filet.

X Q. You mean to say that whenever any one comes to your shop, five or ten years ago, and asked for filet lace, you would have to ask them what kind of filet lace they wanted?—A. I think I would.

X Q. You are not sure about that?—A. Old or new, and what kind.

X Q. Old or new?—A. Yes.

X Q. That would mean whether they wanted antique or modern?—A. Antique or modern, yes.

X Q. But it would not mean to inquire whether or not they wanted this particular type of filet lace or some other type?—A. No, I don't think it would.

From this testimony the query naturally arises: If, as the witness stated, when any one came to her shop and asked for filet lace she would have to inquire what kind they wanted, why did the witness later state that by such inquiry the person "would not mean to inquire whether or not they wanted this particular type of filet lace or some other type?"

When this witness was asked if she did not remember testifying in the former filet lace cases that this mesh or net was made in the districts where the fishermen lived and that it was the same people in the same families who made the fish-nets for fishing use, who also made this filet net, the witness admitted that "It might easily be so," and added:

I still think so, but I think if I may say so, that the one is made for ornament, and the other for utility. When it is made for ornament, it is lace, and when it is made for utility purposes, for fishing or tennis rackets, or nets, then it is netting.

Referring to exhibit 1, this witness was asked "if you had that same kind of work turned out we will say in piece goods by the yard, a yard wide, and in running lengths, would you then consider that as a lace?" to which she replied: "Not if it is heavy thread." The witness was then interrogated and answered as follows:

X Q. I am not speaking of heavy or light thread. I am asking you whether, where it is the same kind of thread as this?—A. I would speak of that as net.

*   *   *   *   *   *   . *

X Q. The same work when you get it into a finger by reason of your opinion that it requires the skill of a lace maker, to make a finger, would then be lace, rather than net?—A. Yes.

This witness also stated that regardless of the use made of them, whether for ornamentation or for utilitarian purposes, she would call illustrative exhibits J, K, and L figured nets.

Although witness Powys testified that if the mesh or net is made for ornament it is a lace, and if it is made for tennis rackets or fishing nets, then it is nets, we have the defendant's witness following her on the stand testifying:

The first time I make the plain net filet with thick thread that the fishermen used to do. Then we produced here the net filet. Then we produced it for the production of stockings, gloves, cloths, runners, doilies, from fine thread.

When asked how she made filet lace the witness stated:

Any filet with the decoration is called filet. No filet without decoration is called filet.

Although witness Powys insisted in her testimony that the filet net, or mesh, and the embroidering or filling-in process was done by the same person or class of persons, witness Delanoeye testified definitely that "one class makes the mesh or net, and the other worker does the embroidery or ornamentation." This witness also stated that if a glove were made entirely of the net or mesh in exhibit 1, he would call that a filet lace glove. The witness further testified as follows:

X Q. Now I am asking you whether or not it is your opinion that when you have a plain filet net hand of a glove like exhibit 1, which has the knots or dots on the back of the hand, and which you in the previous question said caused them then to be a figured net hand of a glove, whether that in your opinion then makes a figured net hand become a filet lace hand, if that is your position?—A. It does, that is my impression, and always has been. * * *. My idea of filet net is nothing but a square mesh, but when I get a mesh that ceases to be a square mesh, then we are making lace, we are not making net any more, regardless of what the procedure might be.

This witness further testified that illustrative exhibit J is a lace net with dots in it, a copy of an original filet lace; that it is called net because that is the common trade name, but that the original of said exhibit was a filet lace. From this testimony it would appear that anything copied from an original piece of lace would not be lace but net. This witness also admitted that "Figured net is lace to me. * * * I regard all figured net as lace." He also considered "all hand made net as lace."

Witness Cattadori testified for the defendant that filet lace was made in two operations. "First the net is made, and then it is embroidered, but for commercial purposes we have it done by two categories of workers, one category will make the net, and the other make the pattern * * *."

At the last hearing in this case counsel for the plaintiffs made the following statement:

Miss Powys, a Government witness, testified that Buratto is made in one operation, like the gloves in question in this case, exhibit 1, and that Buratto is a kind of filet lace.

We propose to put in evidence a sample of Buratto and refute her testimony in that respect.

Counsel for the plaintiffs then offered the testimony of Vittorio Ando Jesurum who stated he had been engaged in the domestic linen business for the past one and one-half years, but previous to that he had had considerable experience with laces in Venice, Italy, as follows:

It is not only a personal experience; it is a family experience, because the old industry of hand-made lace or hand-made embroidery was revived by a few people in Venice, Italy, after 1807, and chiefly by my grandfather, Micelangelo

Jesurum. This man founded the firm, Ando Jesurum & Co., family firm, with whom I started working myself in September 1926, and I worked in that firm, and wasn't obliged to leave it until December 1938.

At the beginning he had all kinds of jobs, but for the last 5 years he was president and managing director of the firm; in this position he acquired "a rather good experience of all kinds of Italian lace and of some European lace, particularly Belgian laces." In this position his general duties were first, administrative, but "more important in our field, I supervised the production of the goods that were hand-made." In the course of his experience the witness became familiar with an article known as buratto, a sample of which he produced and it was admitted in evidence as illustrative exhibit O.

The witness testified that the name buratto comes from the Latin word "Bura," which means heavy cloth; that it is a loosely woven canvas, which is then embroidered; that there are only two kinds of buratto, but the ground work of each is always the same; that one kind is made with the darning stitch, like illustrative exhibit O and the other is made with a so-called "Italian tailor stitch" or "linen stitch." The witness then pointed out that in the groundwork of illustrative exhibit O the threads are not tied, as is always the case with filet lace and stated that this is the fundamental distinction between buratto and filet lace. The witness also stated that he had manufactured and bought and sold filet lace in large quantities over a long period of time. The witness gave as a further reason for his statement that buratto was not filet the fact that in filet lace the net is tied in each corner with knots, while in buratto there are no knots; that in buratto the ground is a canvas which is woven on a loom, while the foundation of filet lace is an open mesh or net, generally made by hand. He further testified that buratto is always made in two operations and that it is not possible to make it in one operation.

In view of the testimony of witness Jesurum that buratto is not and cannot be made in one operation and that buratto is not any kind of filet lace and the sound reasons given for such testimony we are inclined to the view that such testimony completely refutes that given by witness Powys that buratto can be and is made in one operation and that buratto is a kind of filet lace. In this connection it is significant that counsel for the defendant in his brief filed herein, in detailing and discussing the testimony of the different witnesses, makes no mention of witness Jesurum other than to list his name as one of the witnesses testifying for the plaintiffs. It is also significant that in giving testimony in other cases before this court involving the question of whether certain merchandise was or was not filet lace, witness Powys failed to enlighten the court by a statement that there was a kind of filet lace known as buratto.

Although some of the defendant's witnesses attempted to testify

that exhibit 1 would be a filet lace glove even with the dots or knots on the back of the hand and on the cuff removed or omitted, the weight of the evidence clearly shows that with the dots or knots removed or omitted, exhibit 1 would be nothing more nor less than a plain net glove. We must, therefore, determine in this case whether or not such dots or knots are sufficient to bring the gloves within the provision for laces, as provided for in said paragraph 1529 (a).

On the back of the hand portion of exhibit 1 appear two rows consisting of 11 dots or knots and one row consisting of 13 dots or knots and approximately 2 inches in length. It can scarcely be denied that these dots or knots are designs. The cuffs of exhibit 1 are constructed of much larger mesh than the hand portion and the threads appear to have been doubled. The additional threads in both the hand and cuff portions of the glove were placed there by the worker at the time she reached that particular point in making the glove, as hereinbefore set out. . Whether or not these doubled threads form or produce such designs as rise to the dignity of lace designs is the question to be decided here. On this point thirteen witnesses testified for the plaintiffs that these dots or knots formed by these doubled threads did not produce lace designs, while the five witnesses testified for the defendant that such dots or knots did produce lace designs. As stated by one witness: "It is a design, but nevertheless nobody would buy that design as a lace."

In the case of *Kohlberg* v. *United States*, 27 C. C. P. A. 354, the appellate court described the work on the back of the gloves in that case as follows:

* * * each of the gloves in collective exhibit No. 1 has a design on the back of the hand portion. On three of the gloves the design is of diamond shape, and on the other the design consists of three lines running from points near the fingers and converging near the cuff.

The most the appellate court said regarding those lines was "These designs have a lace-like appearance." The decision in the *Kohlberg* case, *supra*, because of the entirely different state of facts existing in the two cases, cannot be considered as any authority for holding the instant gloves to be lace gloves, or gloves in part of lace.

As heretofore pointed out, the weight of the evidence shows that the gloves in question, in a commercial sense (and we are not here speaking of commercial designation), are known, bought, sold, and used, under the denomination of net gloves, or figured net gloves, and are not known, bought, sold, and used, under the denomination of lace gloves of any kind. Bearing in mind the fact that the Congress, in providing for laces in said paragraph 1529 (a) must be understood to have used that term in its known commercial sense, the decision of the United States Supreme Court in *Two Hundred*

*Chests of Tea*, 9 Wheat., 189, 6 L. ed. 128, is here applicable, from which we quote as follows:

\* \* \*. The object of the duty·laws is to raise revenue, and for this purpose to class substances according to the general usage and known ·denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists, or botanists. *It applied its attention to the description of articles as they derived their appellations in our own markets, in our domestic as well as our foreign traffic.* And it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. *Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation.* And even if the article has undergone some variations in quality or mixture, during the intermediate period from 1789 to 1816, when the last act passed, but still retains its old name, it must be presumed that Congress, in this last act, referred itself to the existing standard, and not to any scientific or antiquated standard.

*The true inquiry, therefore, is, whether, in a commercial sense, the tea in question is known, and bought, and sold, and used, under the denomination of bohea tea.* [Italics ours.]

It might be conceded in the instant case that the dots or knots on the gloves, exhibit 1, have a lace-like appearance. This, however, does not serve to bring the gloves within the· provision for laces. Many things have lace-like appearances which do not answer to the provision for laces here under consideration. If we should hold the involved gloves to be lace, then we would feel constrained to hold any piece of net upon which appeared a few dots or knots to be lace, and thus completely invade the field of figured nets.

The weight of the evidence in this case shows that the doubled threads forming the dots or knots on the back of the hand and on the cuff of the instant gloves do not constitute lace designs. Therefore the gloves are not lace gloves, but figured net gloves.

Paragraph 1430 of the act of 1922 contained an *eo nomine* provision for "nets or nettings, embroidered or otherwise," but paragraph 1529 (a) of the act of 1930 contains no such provision. The only provision in paragraph 1529 (a) which can be construed as covering nets or nettings is the provision for fabrics and articles made on a net machine. Since it has been agreed in the present case that the gloves are made entirely by hand, it is at once apparent that they are not fabrics and articles made on a net machine.

After a careful examination and consideration of all the evidence, including an examination and inspection of the samples, for the reasons herein stated, we hold the merchandise described on the invoice as "cotton net gloves," item 800, to be properly dutiable at 37½ per centum ad valorem under paragraph 919 of the act of 1930, as claimed by the plaintiffs.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.