UNITED STATES *v.* SHALOM & Co. (No. 4489) [1]

[1] C. A. D. 311.

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

*Lane & Wallace* (*Thomas M. Lane* and *Samuel Isenschmid* of counsel) for appellees.

[Oral argument April 10, 1945, by Mr. Donohue and Mr. Thomas M. Lane]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Second Division) holding certain imported gloves dutiable as articles of wearing apparel, in chief value of cotton, at 37½ per centum ad valorem under paragraph 919 of the Tariff Act of 1930, as claimed by the importer (appellee), rather than as articles in part of lace at 90 per centum ad valorem under paragraph 1529 (a) of that act, as assessed by the collector at the port of New York.

The paragraphs in question, so far as pertinent, read:

PAR. 919. Clothing and articles of wearing apparel of every description, manufactured wholly or in part, wholly or in chief value of cotton, and not specially provided for, 37½ per centum ad valorem. * * *

PAR. 1529. (a) Laces, lace fabrics, and lace articles, made by hand or on a lace, net, knitting, or braiding machine, and all fabrics and articles made on a lace or net machine, all the foregoing, plain or figured; lace window curtains, veils, veilings, flouncings, all-overs, neck rufflings, flutings, quillings, ruchings, tuckings, insertings, galloons, edgings, trimmings, fringes, gimps, and ornaments; braids, loom woven and ornamented in the process of weaving, or made by hand, or on a lace, knitting, or braiding machine; and fabrics and articles embroidered (whether or not the embroidery is on a scalloped edge), tamboured, appliquéd, ornamented with beads, bugles, or spangles, or from which threads have been omitted, drawn, punched, or cut, and with threads introduced after weaving to finish or ornament the openwork, not including one row of straight hemstitching adjoining the hem; all the foregoing, and fabrics and articles wholly or in part thereof, finished or unfinished (except materials and articles provided for in paragraph 915, 920, 1006, 1111, 1504, 1505, 1513, 1518, 1523, or 1530 (e), or in Title II (free list), or in subparagraph (b) of this paragraph), by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of filaments, yarns, threads, tinsel wire, lame, bullions, metal threads, beads, bugles, spangles, or rayon or other synthetic textile, 90 per centum ad valorem. * * *

On the trial in the court below, the record in the case of *Shalom & Co.* v. *United States*, 10 Cust. Ct. 6, C. D. 714, was made a part of the record in the instant case, and it was agreed by counsel for the parties that the gloves involved in that case were the same in all material respects as those here in question, and that the exhibits in the incorporated record should be received in evidence in the instant case under the same exhibit numbers as in the former case.

Appellee's Exhibit 1 is a glove and is concededly representative of the gloves here in question.

It was agreed by counsel for the parties on the trial below that the involved gloves are composed wholly of cotton, having a staple less than 1⅛ inches in length, and that they are made by hand.

It appears from the record that the gloves in question are made in one continuous operation with a "Continuous thread" which is knotted at its intersections to form mesh.

The mesh in the wrist portion of Exhibit 1 is formed of a double row of thread and is of two sizes, each of which is larger than the mesh in the hand portion. The thread in the wrist portion is so manipulated at certain intersections as to form knots of a leaflike design. These designs are arranged so as to form four separate triangles. The top edge of the cuff or wrist portion is scalloped. On the back of the hand portion appear three rows of knots which are formed in the same manner as the knots in the wrist portion and which are also leaflike in design. The three rows of knots extend lengthwise of the glove. The middle row is approximately 2⅝ inches in length and about three-eighths of an inch longer than the outside rows.

On the trial below, counsel for the importer (appellee) introduced considerable evidence for the purpose of establishing that the involved gloves are neither lace gloves nor gloves made in part of lace, but, on the contrary, are filet net gloves.

Many of appellee's witnesses testified that they bought and sold gloves like those here in question as filet net gloves, and that they never bought or sold them as lace gloves. They further testified that the involved gloves are not lace gloves of any kind but, on the contrary, are filet net gloves. Some of them testified that the involved gloves have inwrought figures made by looping and grouping the thread in one operation to form preconceived designs or patterns, and that such designs are ornamental and ornament the gloves.

One of appellee's witnesses, Harry J. Levine, a partner in the firm of the Levine Deikman Co., an importer of laces, lace gloves, lace tablecloths, and fancy linens, stated that he would not consider the designs on the back and wrist portion of Exhibit 1 ornamental, but thought that they served a utilitarian purpose in that the design on the back of the glove gave the glove strength, and the design on the cuff made the cuff last longer.

Appellee's witness Harry Boshi, who had been associated with the appellee company for about 20 years and had had experience in the handling of laces for about 35 years, stated that the design on the cuff of the glove was ornamental, but that it was not comparable or similar to any design on laces with which he was familiar.

Appellee's witness Ella Kolb testified that she had been connected with Stern Bros. and in the lace department of that concern for 28

years, and that the designs on Exhibit 1 were ornamental and decorative, but were not similar to or comparable with any lace design with which she was familiar.

The witness Arthur P. Simpson, testifying for appellee, stated that he had been in charge of the lace department of B. Altman & Co.; that the designs on Exhibit 1 were for the purpose of ornamentation; that they ornamented and decorated the glove; and that they were not similar to any designs he had ever seen on laces with which he was familiar.

Appellee's witness Philip M. Luce stated that he had been engaged in buying and selling laces for approximately 30 years, and that he did not know whether or not Exhibit 1 was ornamented by the designs appearing thereon.

Appellee's witness Alfred Kohlberg, who from 1915 to December 7, 1941, was engaged in importing Chinese laces, embroideries, handkerchiefs, and silks, testified that the designs on exhibit 1 were ornamental and decorative; that they were placed on the glove in accordance with a preconceived design or pattern; that he did not believe that they served any utilitarian purpose; that there were probably hundreds of thousands of lace designs; that he was sure he had not seen all of them; and that lace designs "to the person in the trade, have some characteristics which divide them into classifications, and new designs coming out nearly, in all cases, fit into those subdivisions. An innumerable variety of designs all fall into certain classifications, and when I say this [Exhibit 1] is not a lace design it is not a design which falls into the classifications of lace design *I have been familiar with.*" [Italics ours.] The witness further stated that the simplest figure on a net is a dot; that a net might still be a net with a figure a little more elaborate than a dot, but that if the figure was "very elaborate" the net would become a lace; and that as there was such a large variety of articles in the trade there were "borderline cases where there might be a difference of opinion in the trade as to whether an article was or was not a lace."

Several illustrative exhibits were introduced in evidence by counsel for the importer for the purpose of drawing a comparison between what the witnesses called "figured" or "filet net" and "filet laces" which were made in two operations, that is, laces where net was used as a foundation and designs subsequently applied thereto.

Owing to the views we hold, it is unnecessary that we discuss those exhibits. It is sufficient to say that the designs on the laces introduced in evidence as illustrative exhibits were much more elaborate than those on Exhibit 1.

On cross-examination some of the witnesses for appellee stated that the dictionary definitions of the term "lace" which were read to them were too broad. However, when they attempted to define lace,

they frankly admitted that their definitions were not sufficiently broad to include all the laces with which they were familiar.

Witnesses for the Government (appellant) testified that the involved gloves are, in fact, filet lace gloves.

In its decision in the case of *Shalom & Co.* v. *United States, supra,* the court considered the evidence introduced in that case, which was incorporated in the record in the instant case, and held that, although the importer had not established commercial designation, it had established that in a commercial sense the gloves in question were known, bought, and sold as net gloves or figured net gloves, and were not known, bought, or sold as lace gloves. In so holding, the court stated that, although it might be conceded that the designs on the involved gloves have a lacelike appearance, they do "not serve to bring the gloves within the provision for laces." The court further stated, among other things, that—

Many things have lace-like appearances which do not answer to the provisions for laces here under consideration. If we should hold the involved gloves to be lace, then we would feel constrained to hold any piece of net upon which appeared a few dots or knots to be lace, and thus completely invade the field of figured nets.

The weight of the evidence in this case shows that the doubled threads forming the dots or knots on the back of the hand and on the cuff of the instant gloves do not constitute lace designs. Therefore the gloves are not lace gloves, but figured net gloves.

In the instant case, the trial court held that the weight of the evidence established that the involved gloves are not lace gloves, but are, in fact, figured net gloves, and, accordingly, held that the gloves in question were properly dutiable at 37½ per centum ad valorem under paragraph 919, *supra.*

It is contended here by counsel for the Government that the involved gloves are articles in part of lace within the common meaning of the term "lace"; that appellee failed to establish commercial designation, that is, that in the trade and commerce of the United States the term "lace" has a meaning which differs from its common meaning, and that such meaning is definite, uniform, and general throughout the United States and excludes the articles in question; and that, therefore, the trial court erred in holding that the involved gloves were not articles in part of lace within the purview of paragraph 1529 (a), *supra.*

Counsel for appellee (importer), on the other hand, contend that although the involved gloves may be in part of lace within the common meaning of the term "lace" as defined by the lexicographers, we should accept the views of the expert witnesses who testified for appellee to the effect that they are not in part of lace but are filet or figured net gloves; that the dictionary definitions of the term "lace" are too broad,

being sufficiently broad, in fact, to include figured net; that "not only is a pattern or design essential to constitute an article lace, but such pattern or design must be of sufficient importance to characterize as lace the article on which it appears"; and that "The degree of ornamentation necessary to constitute lace is a question of fact to be determined by testimony."

Lace is defined by the lexicographers as follows:

LACE. * * * the name applied to ornamental openwork formed of threads * * * , looped or plaited or twisted together by hand, (1) with a needle, when the work is distinctively known as "needlepoint lace"; (2) with bobbins, pins and a pillow or cushion, when the work is known as "pillow lace"; and (3) by steam-driven machinery, when imitations of both needlepoint and pillow laces are produced.. Lace-making implies the production of ornament and fabric concurrently. *Without a pattern or design the fabric of lace cannot be made.* [Italics ours.] (Encyclopaedia Britannica, 11 ed., vol. 16, p. 37.)

*Lace, n.* 1. A delicate openwork fabric or network of threads * * * *usually ornamented with inwrought or applied figures or patterns.* It is made both by hand and by machinery. * * * imitation lace, any lace made by machinery. [Italics ours.] (Funk & Wagnalls New Standard Dictionary.)

*lace, n.* * * * 5. a An *openwork figured tissue* made from fine thread, * * * so manipulated as to form the *patterns and ground of that fabric either in one continuous operation or in separate pieces which are afterward joined.* [Italics ours.] Handmade, or "real" laces are made by the needle, (*needlepoint,* or *point, lace*), or on a pillow with bobbins and pins (*bobbin,* or *pillow, lace*) or, less often, by crocheting or knotting. In machine-made lace, the threads are arranged sometimes as in handmade lace, but sometimes differently in an attempt to produce the same effect. (Webster's New International Dictionary.)

In the Summary of Tariff Information, 1929, prepared by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives, at page 2025, lace is defined as follows:

Lace is *ornamental network* made by intertwisting threads to form a pattern. When made by hand it is termed "real" or "point" lace, as distinguished from machine-made lace, sometimes known as imitation lace. Modern lace is mainly machine-made, the principal machine used being the Levers, particularly the type of Levers known as the "go-through." [Italics supplied.]

Lace was similarly defined in the Summary of Tariff Information, 1920, page 553, and in the Summary of Tariff Information, 1921, page 1156.

We are unable to agree with counsel for appellee that the definitions of lace, hereinbefore quoted, are too broad, although some of appellee's witnesses so testified. It should be recalled that none of those witnesses was able to give a definition which was satisfactory even to him. The most that can be gleaned from the testimony is that those witnesses were of opinion that a design more ornamental than those on Exhibit 1 is required in order to give a fabric the character of lace.

Whether the inwrought patterns or designs appearing on the back of the hand portion and the wrist portion of exhibit 1 are ornamental

or are of such character as to ornament either of those portions is a question of fact. See *United States* v. *Mutual China Co. et al.*, 9 Ct. Cust. Appls. 232, T. D. 38202, 37 Treas. Dec. 225. However, in view of the dictionary definitions of lace, hereinbefore quoted, and the quoted definition of lace appearing in the Summary of Tariff Information, 1929, which was called directly to the attention of the Congress and which was before that body at the time of the enactment of paragraph 1529 (a), *supra*, we are of opinion that when it has been established, as it has in the instant case, that inwrought patterns or designs are ornamental or are of such character as to ornament the net fabric on which they appear, they are of sufficient importance to characterize as lace at least that portion of the fabric on which they appear, and that the degree of ornamentation is immaterial and is, therefore, not a question of fact to be determined by testimony as argued by counsel for appellee.

Owing to the fact that it clearly appears from such testimony of record as there is on the subject that the preconceived inwrought figures or designs on exhibit 1 are ornamental and ornament the exhibit, it is immaterial, so far as the common meaning of the term "lace" is concerned, what degree of ornamentation they possess. Furthermore, it is well settled that the common meaning of a tariff term is not a question of fact but a question of law. *United States* v. *Florea & Co., Inc.*, 25 C. C. P. A. (Customs) 292, 296, T. D. 49396.

We are of opinion that those portions of Exhibit 1 which are ornamented with preconceived inwrought ornamental figures or designs are lace within the common meaning of that term, and that, although the lace had no separate and independent existence as such, the involved articles, of which exhibit 1 is representative, are in part of lace within the purview of paragraph 1529 (a), *supra*. See *Alfred Kohlberg, Inc.* v. *United States*, 27 C. C. P. A. (Customs) 354, C. A. D. 111.

It will be observed that paragraph 1529 (a), *supra*, provides for articles wholly or in part of lace "by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of filaments, yarns, threads," etc.

In view of the fact that the Congress has provided in paragraph 1529 (a), *supra*, that articles in part of lace "by whatever name known" shall be dutiable thereunder, and as we hold on the record presented that the involved articles are in part of lace, it is immaterial by what name they are bought and sold and designated in the trade and commerce of the United States. See *Kotzin Bros.* v. *United States*, 14 Ct. Cust. Appls. 99, 104, T. D. 41589.

For the reasons herein stated, we are constrained to disagree with the conclusion reached by the trial court.

The judgment is *reversed*.